UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

UNITED STATES OF AMERICA,

     -against-

WALIK WILLIAMS,

              Defendant.

--------------------------------------------------x

**SUPPLEMENTAL
MEMORANDUM**
15-CR-192 (FB)

*Appearances:*
*For the United States of America:*
ROBERT L. CAPERS
United States Attorney
Eastern District of New York
BY: JENNIFER S. CARAPIET
DAVID NORWICH GOPSTEIN
Assistant United States Attorneys
271 Cadman Plaza East
Brooklyn, NY 11201

*For the Defendant*
MICHAEL K. SCHNEIDER
Federal Defenders of New York, Inc.
One Pierrepont Plaza, 16th Floor
Brooklyn, NY 11201

**BLOCK, Senior District Judge:**

     Walik Williams ("Williams") is charged with knowingly and intentionally possessing

a firearm in violation of 18 U.S.C. § 922(g)(1). Williams moved the court to suppress the

loaded firearm found on his person because it was obtained pursuant to an illegal search.

The Court held a hearing on the motion during which two police officers testified for the

government, and Williams's brother testified on his behalf. On November 5, 2015, the

Court made findings of fact and based on those findings granted the defendant's motion in

a brief opinion.

     The government has filed a notice of appeal. Because the Second Circuit might

benefit from a more in-depth explanation of how the Court made its findings of fact, this supplemental memorandum explains more fully the Court's analysis of the testimony and evidence adduced at the suppression hearing. *See, e.g.*, *United States v. Adgebite*, 713 F. Supp. 559, 560 (E.D.N.Y. 1988) (Korman, J.) (issuing a supplemental opinion sua sponte to provide further explanation for an issue to be raised on appeal); *see also Miranda v. Bennett*, 322 F.3d 171, 175-76 (2d Cir. 2003) (describing the benefit to the circuit court and the parties of having the district court's complete analysis). This memorandum supplements the findings of fact and conclusions of law made in the previous order under Federal Rule of Criminal Procedure 12(d).[1]

# I

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. CONST. amend. IV. "A warrantless search is '*per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Aguiar*, 737 F.3d 251, 259 (2d Cir. 2013) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). For example, an officer may conduct a "patdown

---

[1]In its prior M&O, the Court "recognize[d] the difficulty of police work and the benefits derived from the removal of a firearm from the streets of New York City." *United States v. Williams*, No. 15-CR-192, at 5 (E.D.N.Y. Nov. 5, 2011). Accordingly, it took pains not to denigrate the officers but felt constrained, "in light of the circumstances surrounding the underlying search" to grant the motion. *Id.* Because of the appeal, the Court is now obliged to give the Circuit Court a more fulsome account of the rationale that required it to grant the suppression motion.

search" of an individual for the limited purpose of discovering "weapons which might be used to harm the officer or others nearby." *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993). However, to conduct such a search, the officer must have a reasonable suspicion "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Reasonable suspicion must be based on "something more than an 'inchoate and unparticularized suspicion or "hunch."'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27).

Williams had the initial burden of demonstrating that the police search was conducted without a warrant. *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980). It is undisputed, however, that the firearm was seized pursuant to a warrantless search. Accordingly, the burden shifted to the government to demonstrate that the search did not violate the Fourth Amendment. *Id*; *see also United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993) ("[T]he government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement." (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973))).

It was thus incumbent upon the government to prove by a preponderance of the evidence that the officers who searched Williams had at least a reasonable suspicion that he was armed and dangerous. *See, e.g.*, *United States v. Bristol*, 819 F. Supp. 2d 135, 142

(E.D.N.Y. 2011). During the suppression hearing, two police officers testified that they saw Williams and another individual walking down Lexington Avenue in Brooklyn, and that Williams used one hand to pull up the side of his sweatshirt such that the officers could see a firearm tucked into the waist of his pants. The officers both testified that after observing the gun, they stopped their car, and quickly apprehended Williams and the other individual. To be sure, if the officers did in fact observe a firearm in Williams's waistband, they would have had the requisite suspicion to conduct the search at issue in compliance with the Fourth Amendment. Hasheem Slaughter ("Slaughter"), Williams's brother, was walking with Williams that evening, and testified that Williams did not raise his sweatshirt, and that the officers stopped and searched them without observing any suspicious activity. Because the government had the burden of proof, if the Court had found the differing stories equally plausible, the law would have compelled the suppression of the firearm. *See United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses."). That being said, as is elaborated below, the Court found that the officers' account of events was less plausible than the one relayed by Slaughter.

## II

### A. The Officers' Testimony

Two police officers testified on behalf of the government, Robert O'Brien

4

("O'Brien") and Kevin Costello ("Costello").

They testified that around 12:45 a.m. on October 23, 2014,[2] they were in plainclothes in an unmarked Chevy Impala patrolling the area around Lexington Avenue and Marcy Avenue in Brooklyn. Tr. 10-12, 57.[3] Costello was driving and O'Brien was in the passenger seat. Tr. 15-16, 59. O'Brien testified that many residents in the area recognize unmarked Chevy Impalas as police vehicles. Tr. 30. As they drove slowly down Lexington Avenue, they observed two individuals walking side-by-side on the sidewalk toward the direction of the vehicle. Tr. 15-16, 60-61. The individual farther from the vehicle was Williams. Tr. 32, 70. O'Brien testified that Williams "lifted up his shirt with his right hand," and that he could see "the black grip of a firearm in the defendant's waistband." Tr. 16. Costello similarly testified that he saw Williams "holding up an article of clothing and [he] could see a firearm exposed in his waistband." Tr. 61.

O'Brien testified that he then believed that Williams saw their vehicle and "threw his shirt down" and "pushed the firearm over to the right." Tr. 18. O'Brien continued that Williams "adjusted the firearm, and then he took his jacket and threw his jacket forward and tried to walk off quick." Tr. 18. Costello also testified that after he saw the firearm,

---

[2]No witness testified as to the weather conditions that night except to say that it was "clear." Tr. 11, 59. However, the clothing the defendant was wearing, namely a large leather jacket, a sweatshirt, t-shirt, jeans, and long-john bottoms, indicate that it was a chilly evening. *See* Def. Exh. E, Tr. 92.

[3] Citations to Tr. refer to the transcript of the suppression hearing.

"the defendant dropped the article of clothing he had and continued to walk towards the direction he was originally walking." Tr. 62.

O'Brien continued: "Immediately after I saw the firearm I said either 'gun, stop' or 'stop, gun.' Officer Costello immediately stopped the vehicle. I immediately exit[ed] the vehicle, approach[ed] the defendant, and grab[bed] the defendant." Tr. 18-19. "I grabbed the defendant's shoulder with my right hand, and I felt for the firearm with my left hand; and I immediately placed my hand on the firearm where I had seen it." Tr. 20. Officer O'Brien removed the firearm from Williams's waistband and placed Williams under arrest. O'Brien testified that while he was arresting Williams that he was "unsure" of Costello's exact position because he "was very focused on the defendant." Tr. 22.

Costello testified that upon seeing the firearm in Williams's waistband, he notified O'Brien that he observed a gun, stopped the vehicle, identified himself as a police officer and told the individuals to stop. Tr. 62-63. While Slaughter stopped, Williams continued to walk. Costello recounted: "At that point I went over to the individual that stopped, made sure that he complied and stopped; and then Officer O'Brien I guess went over to [Williams] and began to stop him." Tr. 63. Costello did not frisk Slaughter at that time, and once Costello "realized [Slaughter] was complying fully, [Costello] went quickly back to Officer O'Brien to make sure he was okay." Tr. 76

O'Brien testified that during his stop of Williams he "grabbed both of [Williams's] arms behind his back with both of [his] hands." Tr. 40. O'Brien then "hooked [his] left

arm underneath [Williams's] left arm" to hold both of Williams's arms with his left arm, and then he removed the firearm with his right hand. Tr. 40. Costello testified, however, that at the time O'Brien removed the firearm, Costello was behind Williams "holding onto his arms." Tr. 64. Costello elaborated that he "was able to grab [Williams's] arms from behind pretty much and kind of hold them by like below his elbows and just hold that back while the gun was already being pulled out." Tr. 77-78. According to Costello's testimony, Costello held Williams's arms behind his back while O'Brien removed the firearm, and Slaughter, who had not yet been frisked, stood nearby watching. Tr. 77-79. Both officers testified that they did not know at that time whether Slaughter was armed. Tr. 36, 78.

Officer O'Brien testified that he was aware that there were other police officers patrolling nearby and that he could communicate with them directly through a point-to-point radio. Tr. 28-29. Neither O'Brien nor Costello testified that they contacted other officers for support before conducting the stop, in fact, both officers testified that the stop was conducted mere seconds after they observed the firearm. Tr. 21, 28, 63-65. Additionally, upon exiting the vehicle, neither officer instructed Williams or the other individual to put their hands up, or make their hands visible. Tr. 75.

## B. Slaughter's Testimony

Slaughter testified that on the evening in question he and Williams were walking home from a party in Bushwick. Tr. 86-87. Before leaving the party, Slaughter observed

Williams tuck a firearm in the right side of his long-john bottoms, which Williams was wearing underneath his jeans. Tr. 91-92. Slaughter testified that after the 20-to-30 minute walk from Bushwick to the intersection of Marcy Avenue and Lexington Avenue, they observed two uniformed police officers standing in front of a grocery store at the intersection. Tr. 88, 93. Slaughter and Williams crossed to the other side of Lexington Avenue to avoid walking passed the uniformed officers and because Slaughter was staying at a residence on that side of the block. Tr. 90-91.

Slaughter testified that as they walked Lexington Avenue between Marcy Avenue and Tompkins Avenue he saw two unmarked Chevy Impalas approach. Tr. 88-89. He testified that he understood the Impalas to mean police. Tr. 89. The first impala drove past Slaughter and Williams, but the second stopped. Tr. 89.

Slaughter testified that the driver of the stopped car rolled the window down and the passenger yelled, "What's up, fellows?" Tr. 94. Slaughter did not reply, but Williams said, "Ain't nothing." Tr. 94-95. Slaughter and Williams continued to walk down the street, but the plainclothes officers got out of the car and stood in their way. Tr. 95. The officers then asked, "Do you guys have anything on you?" Tr. 95. They both replied that they did not have anything. Tr. 95-96.

Slaughter testified that one officer patted him down and then searched his pockets, which revealed no weapons or drugs. Tr. 96. The officers then patted down Williams, which resulted in the discovery of Williams's firearm. Tr. 97-98. Both Williams and

Slaughter were placed under arrest.  Tr. 98.

Slaughter stated that along their walk from Bushwick to Lexington Avenue, Williams never showed him the gun after tucking it in his pants, nor lifted his shirt to display the gun. Tr. 98-99.

## III

If the Court accepted the officers' account of events as more likely, the Court would have found that the officers had the requisite suspicion because they would have had probable cause upon seeing the firearm when Williams lifted his sweatshirt.  However, under Slaughter's recounting of the facts, Williams never lifted his sweatshirt, the officers could not see the firearm, and there was no basis upon which the officers could have formed a reasonable suspicion.  Even if the Court found both stories equally plausible, it would be compelled to suppress the firearm because, as is mentioned above, the government would have failed to carry its burden of proving by a preponderance of the evidence that the search of Williams fell into an exception to the warrant requirement.  But the stories were not equally plausible.  The testimony offered by the government was questionable in several respects.

First, it is unlikely that Williams would have pulled up his clothing to reveal the firearm he had hidden in his pants while walking down Lexington Avenue and being able to see that a car was approaching.[4]  As O'Brien acknowledged, many residents in the area

---

[4] On cross examination, Officer O'Brien testified:

recognize the unmarked Chevy Impala that approached Slaughter and Williams to be a police vehicle. Tr. 30. Slaughter testified that he recognized it as such. Tr. 89. Further, Slaughter testified that he and Williams had just crossed the street in part to avoid passing two uniformed officers. Indeed, O'Brien testified that there were other officers patrolling the area that night as well. Accordingly, it seemed far-fetched that given the police presence in the immediately surrounding area that Williams would be lifting his clothing to reveal his firearm for no apparent purpose. To that end, Costello agreed that such an explanation might be hard to believe. When the Court expressed concern about the plausibility of Williams lifting his shirt on a late night as a black car approached, Costello stated: "I understand it sounds crazy. I don't know what the subject was thinking at the time. He might have been showing it to him. I don't want to go inside of his head." Tr. 80.

Second, the officers' testimony regarding who held Williams's arms while the firearm was removed was inconsistent. O'Brien testified that he held Williams's arms behind him with both hands, and then hooked his left arm to hold both of Williams's arms

---

Q. And as officer Costello drove down the block, were the lights on the Impala on?
A. The headlights?
Q. Yes.
A. Yes.
Q. And so somebody who is walking towards you as you drive towards them would be able to see that a car was coming down Lexington Street towards them; is that accurate?
A. Yes. Tr. 30

and removed the firearm with his right hand. Tr. 40. Costello, on the other hand, testified that *he* held Williams's arms behind his back while O'Brien removed the firearm. Tr. 77-78. This inconsistency casted doubt on the veracity of the officers' testimony.

Third, the officers' testimony that immediately after observing the firearm, they stopped, exited the car, ran over to Williams and Slaughter, and removed the firearm, appears to the Court to be a dangerous way of approaching a pair of individuals, one of whom is apparently known to be armed. O'Brien testified that there were other police officers nearby, who they could communicate with directly, yet prior to exiting the vehicle, O'Brien and Costello did not ask for backup. Neither O'Brien nor Costello drew their weapons when they exited their vehicle, Tr. 38, 75, but they also did not instruct Williams and Slaughter to put their hands up or on their heads. Tr. 75. And while both O'Brien and Costello testified that they knew Williams was armed, neither of them knew whether Slaughter was also armed and dangerous. Tr. 36, 78-79. Yet O'Brien testified that he did not frisk Slaughter because he was focused on the defendant, Tr. 22, 41, and Costello stated that he only made sure Slaughter had stopped prior to helping O'Brien remove the firearm from Williams. Tr. 76. According to Costello's testimony, Slaughter, who had not yet been frisked and it was still unknown whether he was armed, stood off to the side watching as Costello and O'Brien removed the firearm from Williams. Tr. 78-79. Both officers acknowledged that this was a very dangerous way to proceed with a search, Tr. 36, 78-79, and thus undermines the credibility of their accounts.

On the other hand, Slaughter's testimony presented no circumstances which were hard to believe, nor required the Court to accept as true any testimony that "sounds crazy." Tr. 80. The government attempted to impeach Slaughter's credibility by establishing that he had a motive to lie by asking whether he wanted to see his own brother go to jail. Tr. 102-03. However, this was not nearly enough for the Court to discredit his testimony and overlook the questionable aspects of the officers' testimony.

\*       \*       \*

For the foregoing reasons, the Court granted Williams's motion to suppress.


/S/ Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
December 17, 2015